# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### HUNTINGTON DIVISION

**SHAWN D. MCCALLISTER,**

> **Plaintiff,**

**v.**                                                    **Case No.: 3:17-cv-00375**

**NANCY A. BERRYHILL,**
**Acting Commissioner of the**
**Social Security Administration,**

> **Defendant.**

### PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. The matter is assigned to the Honorable Robert C. Chambers, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' briefs wherein they both request judgment in their favor. (ECF Nos. 6, 7, 8).

The undersigned has thoroughly considered the evidence, the applicable law, and the arguments of counsel. For the following reasons, the undersigned respectfully **PROPOSES** that that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **GRANT** Plaintiff's request for judgment

on the pleadings, (ECF Nos. 6,8), to the extent that it requests remand of the Commissioner's decision; **DENY** Defendant's request to affirm the decision of the Commissioner, (ECF No. 7); **REVERSE** the final decision of the Commissioner; **REMAND** this matter pursuant to sentences four and six of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this PF&R; and **DISMISS** this action from the docket of the Court.

## I. <u>Procedural History</u>

On July 30, 2013, Plaintiff Shawn D. McCallister ("Claimant") protectively filed an application for DIB, alleging a disability onset date of December 18, 2012, due to "herniated disc, numbness in hands, muscle spasms, sciatica, and knee problems" (Tr. at 312-18, 360). The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration. (Tr. at 134, 163-65, 172-74). Claimant filed a request for an administrative hearing. He had an initial hearing on July 22, 2015 and a supplemental hearing on November 18, 2015 before the Honorable Robert M. Butler, Administrative Law Judge ("ALJ"). (Tr. at 34-124). By written decision dated January 26, 2016, the ALJ found that Claimant was not disabled as defined by the Social Security Act. (Tr. at 15-28). The ALJ's decision became the final decision of the Commissioner on December 13, 2016 when the Appeals Council denied Claimant's request for review. (Tr. at 1-6).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 1). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of the Administrative Proceedings. (ECF Nos. 4, 5). Thereafter, Claimant filed a Brief in Support of Judgment on the Pleadings. (ECF No. 6.). Claimant argued, *inter alia*, that the Commissioner's decision should be reversed or

remanded on the basis of a subsequent favorable disability determination that was effective on the day after the ALJ's decision presently under review. (*Id.* at 9).

Claimant contended that the "subsequent decision [awarding him DIB benefits] constituted new and material evidence which ought to allow for reversal and/or remand in this matter." (*Id.*). However, Claimant acknowledged a body of case law, including *Baker v. Comm'r of Soc. Sec.*, 520 F. App'x 228, 229 n.1 (4th Cir. 2013), which provided that, in a situation like Claimant's, "new substantive evidence might constitute 'new and material evidence' necessitating remand, but the underlying evidence, not the award, will determine the propriety of a remand." (*Id.* at 10). Therefore, Claimant indicated that he would obtain a copy of the file from his successful application and "thereafter provide this Court with the basis/evidence underlying [his] subsequent award of disability insurance benefits." (*Id.*). However, Plaintiff did not file such additional evidence by the time that the Commissioner filed her responsive brief. Consequently, the Commissioner argued that Claimant "failed to meet his burden of showing that the evidence relied on in reaching the subsequent favorable [decision pertained] to the period under consideration here." (ECF No. 7 at 17).

Claimant later supplemented the record with a copy of a form notice from the Social Security Administration confirming that Claimant was granted disability benefits beginning on January 27, 2016 based upon a primary diagnosis of "Malignant Neoplasm of Gallbladder and Extrahepatic Bile Ducts" and a secondary diagnosis of "[Osteoarthritis] and Allied Disorders." (ECF No. 8-1 at 1). Claimant asserted that such form made "at least a general showing of the nature of the new evidence" and demonstrated that "such new evidence pertain[ed] to the period under consideration in this appeal." (ECF No. 8 at 1-2).

By Order entered October 26, 2017, the undersigned advised Claimant that while the form that he supplied demonstrated that he was granted DIB benefits beginning on the day after the ALJ's decision presently under review, it did not constitute "new and material evidence necessary for this Court to determine the propriety of remand." (ECF No. 9 at 2); s*ee Baker, supra.* Therefore, the undersigned ordered Claimant to supply the Court with the evidence underlying Claimant's subsequent award of benefits. (*Id.* at 2-3).

In response to the foregoing Order, Claimant responded that his file that formed the basis of his subsequent disability award contained "1,000 plus pages of 'new and material' medical records." (ECF No. 10 at 1). Therefore, Claimant provided the Disability Case Document Index on which he annotated the number of pages, which he asserted, contained "new and material" evidence. (ECF No. 10-1 at 1-3). Claimant also provided a Disability Determination Explanation regarding his subsequent application, which contained the findings of an agency non-examining physician, Cindy Osborne, D.O., dated March 24, 2017. (ECF No. 10-2 at 1-10). Further, Claimant provided a record of his visit with Gerrit A. Kimmey, M.D., at Huntington Internal Medicine Group (HIMG) on February 14, 2017 and his visit with surgical oncologist Amanda K. Arrington, M.D., at the Edwards Comprehensive Cancer Center on February 15, 2017. (ECF Nos. 10-3 at 10-14, 10-4 at 4-8).

## II.  Claimant's Background

Claimant was 39 years old on his alleged disability onset date and 42 years old on the date of the ALJ's written decision. (Tr. at 15, 38, 312). He communicates in English and has a high school education. (Tr. at 359, 361). Claimant previously worked as a sales agent for a pest control service, electrician assistant, saw operator, and a machine operator and laborer at a concrete block plant. (Tr. at 79-80, 361).

### III.    Summary of the ALJ's Decision

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 404.1520. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 404.1520(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 404.1520(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, as the fifth and

final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 404.1520(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status requirements for disability insurance benefits through December 31, 2017. (Tr. at 17, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since December 18, 2012, his alleged disability onset date. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "degenerative disc disease of the cervical spine with herniation, lumbar degenerative disc disease with radiculitis and disc protrusion, obesity, chronic pain syndrome, degenerative joint disease of both knees, and costochondritis."[1] (Tr. at 17-18, Finding No. 3). The ALJ also considered Claimant's diabetes mellitus, mild left elbow degenerative joint disease, colon polyp, thyroid nodule, hyperlipidemia, migraines, sleep apnea status-post surgery, gastroesophageal reflux disease (GERD), small hiatal hernia, history of left hand crush

---

[1] Costochondritis, also known as chest wall pain, is an inflammation of the cartilage that connects a rib to the breastbone (sternum). Pain caused by costochondritis might mimic that of a heart attack or other heart conditions and swelling sometimes accompanies the pain. https://www.mayoclinic.org/diseases-conditions/costochondritis/basics/definition/con-20024454.

injury, neuroma in the left foot and heel spur, bilateral hyperkeratosis of the feet, bilateral carpal tunnel syndrome status-post release, degenerative joint disease of the bilateral shoulders, actinic keratosis, liver lesion, adjustment disorder, seizure, and cannabis abuse, but found that the impairments were non-severe. (Tr. at 18-19). Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 19-20, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform a range of light work as defined in 20 CFR 404.1567(b) consisting of: lifting up to 20 pounds occasionally and 10 pounds frequently, standing and walking for about 6 hours, and sitting for up to 6 hours in an 8-hour workday, with normal breaks. The claimant is able to perform occasional crawling, crouching, kneeling, stooping, balancing and climbing ramps or stairs. The claimant cannot climb ladders, ropes, or scaffolds. The claimant is able to perform work that does not involve even moderate exposure to moving machinery or unprotected heights. The claimant is able to perform work that does not involve concentrated exposure to extreme cold, extreme heat, wetness, or excessive vibration.

(Tr. at 20-26, Finding No. 5).

At the fourth step, the ALJ found that Claimant was capable of performing his past relevant work as a sales agent for a pest control service. (Tr. at 26, Finding No. 6). Nevertheless, the ALJ also reviewed Claimant's past work experience, age, and education in combination with his RFC to determine his ability to engage in other substantial gainful activity. (Tr. at 26-27). The ALJ considered that (1) Claimant was defined as a younger individual aged 18-49 on the alleged disability onset date (2) he had at least a high school education and could communicate in English; and (3) transferability of job skills was not material to the disability determination. (Tr. at 26). Given these factors and Claimant's RFC, with the assistance of a vocational expert, the ALJ concluded that Claimant could

perform jobs that existed in significant numbers in the national economy, including document preparer, escort vehicle driver, and call out operator, which were at the unskilled sedentary exertional level. (Tr. at 27). Therefore, based upon the above, the ALJ found that Claimant was not disabled and was not entitled to benefits. (Tr. at 27-28, Finding No. 7).

## IV.    Claimant's Challenges to the Commissioner's Decision

Claimant raises numerous challenges to the Commissioner's decision. First, Claimant challenges the ALJ's RFC analysis and finding on the basis that the ALJ failed to properly consider the medical source opinions and evidence in the matter, did not properly evaluate his credibility, and did not accept the testimony of the vocational expert that there were no jobs in the national economy for an individual who is off task 10 percent of the work day or absent one or more days per month. (ECF No. 6 at 5-7). In another challenge to the Commissioner's decision, Claimant argues that his subsequent award of DIB effective the day after the ALJ's decision constitutes new and material evidence justifying reversal and/or remand of this matter because the subsequent award of benefits is based on the same impairments alleged in the instant case. (*Id.* at 9-10). Further, Claimant argues that the Appeals Council did not properly consider the "new and material evidence" that Claimant submitted for consideration. (*Id.* at 8-9).

In response to Claimant's challenges, the Commissioner asserts that the ALJ properly analyzed the evidence, assessed Claimant's credibility, and crafted Claimant's RFC. (ECF No. 7 at 7-13). The Commissioner further argues that the Appeals Council properly considered Claimant's "after-submitted evidence." (*Id.* at 13-15). Finally, as to the subsequent decision awarding Claimant DIB, the Commissioner asserts that the "later determination involved [Claimant's] condition during a different time than the period

under review by this Court and did not affect the decision about [Claimant's] condition in 2012." (*Id.* at 16).

## V.  <u>Relevant History</u>

The undersigned has reviewed all of the evidence before the Court. The information that is most relevant to Claimant's challenges is summarized as follows.

### A. Claimant's Statements

Claimant testified during his administrative hearing on July 22, 2015 that he served in the Navy from 1993 to 1994 before he was medically discharged after falling down steps carrying a drill press and injuring his knees. (Tr. at 104). He worked thereafter, but stopped working in 2012 after he was laid off as a machinist. He testified that prior to being laid off, he was "already having problems" and could not "even perform [that] job anymore." (Tr. at 102-03, 106-07). He stated that his "back is gone," he has costochondritis, his shoulders "are shot," and issues due to "damage in [his] neck." (Tr. at 112).

At the supplemental hearing on November 18, 2015, Claimant stated that he had pain from "head to toe." (Tr. at 57). His chest pain from costochondritis felt like electricity of "small explosions going off" that ran through his chest, shoulders, and hands. (Tr. at 57). He also had right foot pain in the ball of his foot and a bone spur in the back. (*Id.*). On a daily basis, he experienced tingling and numbness that felt like a "burning sensation" in his legs from his sciatic nerve. (Tr. at 57-58). The severity of his symptoms depended on how long he was on his feet and often required him to sit down. (Tr. at 58). He experienced knee pain for 20 years and wore braces on his knees 75 percent of the time; he also wore a back brace 25 percent of the time; and he used a cane. (Tr. at 58-59). He stated that all devices were prescribed to him by the VA hospital. (58.). Finally, he stated

that whenever he used his hands to do anything, they hurt, became numb, or tingled a lot; he experienced low back pain "every day, all day;" and he reported having a constant headache, including during the time that he was testifying. (Tr. at 60-61). His pain averaged a 5 and when it climbed higher, he went to the VA for shots of a non-steroidal anti-inflammatory drug, Toradol, and a narcotic pain reliever, Stadol. (Tr. at 61).

### B. Treatment Records[2]

On August 10, 2012, Claimant presented to the VA with shoulder pain. (Tr. at 672). He noted that he had been receiving cortisone shots in his shoulders for degenerative joint disease/osteoarthritis and recently had an increase in pain after carrying a 50-pound "sack of feed" for 200 feet. (*Id.*; *see* Tr. 696, 698). Claimant exhibited decreased range of motion in both arms. (*Id.*). X-rays of Claimant's shoulders showed degenerative changes. (Tr. at 485). He was given a corticosteroid injection in his left gluteal muscle. (Tr. at 672). During an orthopedic consultation regarding his bilateral shoulder pain later that month, on August 21, 2012, Claimant was assessed with mild osteoarthritis. (Tr. at 524).

On August 26, 2012, Claimant presented for follow up regarding his chronic conditions and to review recent lab work. He had normal results on his cardiovascular, respiratory, and neurological examinations. (Tr. at 1134). He also had a normal gait and blood pressure of 126/87. (*Id.*). For Claimant's neck and low back pain, he was prescribed Etodolac and referred to pain management. (Tr. at 1135). For his type 2 diabetes and hyperlipidemia, he was prescribed Lipitor. (*Id.*).

On September 4, 2012, Claimant had an EMG study performed by Ramon S. Lansang, Jr., M.D., which showed that Claimant had mild right radiculitis emerging from

---

[2] The treatment notes are from the U.S. Department of Veterans Affairs (VA) unless otherwise indicated.

the S1 nerve root with evidence of very minimal spontaneous potentials indicative of denervation and mild axonal loss. (Tr. at 774). The condition was probably subacute to chronic. (*Id.*). Given the mild nature of the findings, surgery was not indicated, but epidural steroid injections were suggested to alleviate the back pain, spasms, and mobility limitations. (*Id.*). Additionally, Dr. Lansang noted that Claimant's MRI suggested facet arthropathy and he could therefore benefit from medial branch block injections. (*Id.*).

On October 4, 2012, Claimant had an orthopedic consultation due to his complaints of right hand pain, weakness, numbness, and tingling. (Tr. at 520). Claimant, who was currently working in a machine shop, stated that he had problems with his right upper arm for "quite some time" and it progressively worsened to the point that he had trouble gripping a steering wheel or hammer or managing a standard-size chain saw; at times, he felt that his right arm was "going to fall off." (*Id.*). It was noted that his nerve conduction study and EMG in July were positive for carpal tunnel syndrome in that extremity. (Tr. at 520-21). On examination, Claimant could make a fist and extend all of his fingers. (*Id.*). The impression was carpal tunnel syndrome and tennis elbow in his right upper extremity. (*Id.*). The plan was a short course of cortisone; continue Etodolac, right carpal tunnel release surgery, and no work for approximately two weeks after surgery. (Tr. at 522).

On October 11, 2012, a CT scan of Claimant's chest showed a stable 4 millimeter nodule and a new 7 millimeter nodule in the middle lobe of Claimant's right lung, a 1.6 millimeter hypodensity in Claimant's left kidney, and possible thyroid nodules of less than a centimeter each. (Tr. at 483). A follow-up ultrasound of Claimant's kidneys on November 5, 2012, revealed that the density in Claimant's left kidney was a cyst. (Tr. at 481-82). Claimant received a corticosteroid injection to treat his right tennis elbow. (Tr.

at 657). It was noted that he was using a tennis elbow strap and tried an oral cortisone, which was not helpful. (Tr. at 660). He used a drill press at work, which made the pain worse. (*Id.*). He was to continue Etodolac and return as needed. (*Id.*).

On December 19, 2012, Claimant had right carpal tunnel release surgery and an injection to treat tennis elbow in his left arm. (Tr. at 628). The following month, on January 11, 2013, Claimant stated that he was doing better following carpal tunnel release surgery, but still had some pain. (Tr. at 622). On February 25, 2013, Claimant had a thyroid ultrasound, which showed that his cystic and solid nodules were stable in size and character as compared to the November 5, 2012 examination. (Tr. at 478, 619).

On April 30, 2013, Claimant presented for a physical examination necessary to obtain his commercial driver's license. (Tr. at 611). His blood pressure was 123/84 and his weight was 288 pounds. (612.). The plan was to switch his medication to the non-steroidal anti-inflammatory drug (NSAID) Voltaren for his arthralgias, obtain a MRI for his low back pain, and test Claimant for thyroid dysfunction. (Tr. at 613). Claimant had a chest CT scan at that visit, which showed borderline expanded lungs, but no acute process in his lungs. (Tr. at 477). He stated that he quit smoking in March. (Tr. at 616).

On May 14, 2013, Claimant had x-rays of his hips and pelvis to evaluate his complaints of pain. (Tr. at 474). There was no acute bone injury. (*Id.*). He also had a lumbar spine MRI due to his complaints of low back pain and left extremity numbness. (Tr. at 475). The MRI was compared to his previous MRI on May 1, 2011. (*Id.*). The impression was that Claimant had a five millimeter right paracentral disc protrusion that was touching the ventral aspect of the right S1 nerve root, but he did not have any significant central spinal canal stenosis. (Tr. at 476). Claimant also had a podiatry consultation for bilateral foot pain that was worse on the left. (Tr. at 514). The assessment

was that his pain was caused by an impinged nerve and xerosis (dry skin). (*Id.*).

The following day, on May 15, 2013, Claimant presented to the emergency room complaining of chest pain. (Tr. at 597). He stated that he awoke in the morning with chest pain on the right side that radiated to his back and worsened with movement and deep breathing. (Tr. at 598). He stated that he "moved a tree" the previous day and was coughing that night. (*Id.*). He did not have shortness of breath or wheezing and he recently quit smoking. (*Id.*). The impression was chest wall pain and costochondritis. (Tr. at 600). Claimant had a CT angiogram of his chest, but there was no evidence of pulmonary embolism, the test was negative for dissection or aneurysm, and there was no acute process demonstrated in Claimant's chest. (Tr. at 473). Claimant was administered a NSAID, Toradol, in the emergency room. (Tr. at 600). He was discharged with prescriptions for a muscle relaxer, methocarbamol; a corticosteroid, methylprednisolone; and a narcotic-like pain reliever, Tramadol. (Tr. at 601). It was also noted that Claimant needed a stress test and costochondral injections could be considered. (*Id.*). Claimant underwent his stress test on June 19, 2013, which was normal. (Tr. at 601-02).

On May 24, 2013, Claimant was informed that his chest CT, CXR, and hips x-rays were normal. (Tr. at 593). The MRI of his back showed small bulging discs at L3-L4 and L4-L5, as well as a broad disc bulge at L5-S1, which contacted the right nerve root and was the likely cause of his pain. (*Id.*). Claimant was advised that he needed an EMG and was prescribed gabapentin to treat his nerve pain. (*Id.*).

On June 4, 2013, Claimant presented with low back pain. (Tr. at 588). He stated that he had back pain for two years, but he "aggravated" it two weeks earlier when he was fishing and a "beaver took off with his line." (Tr. at 591). When he grabbed his pole, he felt like someone stuck a knife through his back into his chest. (*Id.*). Lab work was ordered

13

and he received prescriptions for Toradol and Depo Medrol. (Tr. at 589).

On June 18, 2013, Claimant presented for an unscheduled visit because he was nearly out of his medication for low back pain. (Tr. at 576). He stated that he was carrying a chain and bending and stretching, which exacerbated his back pain. (*Id.*). He was given a 10-day supply of Tylenol with codeine. (Tr. at 576). On that date, Claimant also had an injection of a corticosteroid into his left elbow to relieve swelling and inflammation from tennis elbow. (Tr. at 577, 580). He was still using his elbow brace and was on NSAIDS. (Tr. at 580).

The next day, on June 19, 2013, Claimant presented to the emergency room with right ankle swelling and pain after he tripped while performing yard work. (Tr. at 571). The impression was no acute fracture or subluxation, but some soft tissue swelling over the lateral malleolus. (Tr. at 470-71). X-rays of Claimant's knees showed minimal narrowing of the medial compartment of each knee with small effusions, but no acute fracture. (Tr. at 467).

On July 26, 2013, Claimant again presented to the emergency department stating that his low back pain was worse. (Tr. at 542). He was evaluated for physical therapy, stating that he had low back pain for years with radicular symptoms in his lower extremities, particularly on his right side. (Tr. at 509). Claimant also complained of muscle spasms in his back. (*Id.*). Claimant presented in moderate distress with a guarded gait and decreased trunk rotation. (Tr. at 510). His range of motion was limited and painful in all ranges, but his strength and neurological findings were normal. (*Id.*). Claimant was noted to not be an appropriate candidate for physical therapy because he was unable to tolerate the activities due to pain. (Tr. at 511). He was assessed to have degenerative disc disease and a herniated disc. (Tr. at 544). He was administered Toradol

and an anti-inflammatory glucocortiocosteroid, Decadron, in each hip. (Tr. at 542, 544).

On August 12, 2013, Claimant had x-rays of his cervical spine due to neck pain and headaches, which showed normal results in the cervical spine and mild degenerative changes at C6-C7. (Tr. at 810-11). Later that month, on August 21, 2013, Claimant presented to the emergency room stating that he had pain in his chest, both shoulders, and left elbow. (Tr. at 871). Claimant had chest x-rays to evaluate chest pain, which showed no active disease. (Tr. at 809-10). The impression was multiple somatic complaints of joint and soft tissue pain, which could possibly be fibromyalgia. (Tr. at 874). He also had degenerative joint disease of the spine and shoulders. (*Id.*). He was given an anti-inflammatory glucocortiocosteroid, Solumedrol, and Toradol. (*Id.*).

On August 30, 2013, Claimant had routine follow up of chronic conditions. (Tr. at 863). His blood pressure was "slightly high" at 133/91, but he was not sure if he took his medication the previous night. (Tr. at 864-65). Claimant had a thyroid ultrasound, which showed that his thyroid nodules were unchanged since February 2013. (Tr. at 808). For diabetes, Claimant was started on metformin, given aviva, and he was to continue Lisinopril. (*Id.*). It was noted that Claimant's liver enzymes were elevated. (Tr. at 866). The plan was to bring Claimant's diabetes under control before addressing the concerns regarding his liver. (Tr. at 865-66).

On September 3, 2013, Claimant presented for chest wall and low back pain. (Tr. at 819). The impression was costochondritis, low back pain with lower extremity radiculitis that was worse on the right, and lumbar degenerative disc disease. (Tr. at 823). Claimant was offered joint injections. (*Id.*). The following day, he had a neurosurgery consultation at which his motor strength was normal, but his deep tendon reflexes were decreased in his lower extremities. (Tr. at 825-26). No surgical intervention was indicated

for his low back pain and a MRI would be obtained to evaluate his shoulder pain. (*Id.*).

On September 9, 2013, Claimant had a corticosteroid injection in his left elbow. (Tr. at 853). He was recommended for left carpal tunnel release surgery. (*Id.*). Later that month, on September 16, 2013, Claimant had a MRI of his thoracic spine without contrast, which showed disc extrusion at C6-C7 with moderate spinal canal stenosis, but Claimant's thoracic spine was intact. (Tr. at 807-08). On September 18, 2013, Claimant had another corticosteroid injection, this time in his sternum. (Tr. at 833).

Claimant underwent left carpal tunnel release surgery. On October 10, 2013, Claimant stated that he did not have pain or problems following surgery, there was no sign of infection, and Claimant had full range of motion in his hand and fingers. (Tr. at 940-41). Claimant presented for additional follow up on October 17, 2013 at which time he denied pain, tingling, or numbness and his hand strength was good. (Tr. at 934).

On October 11, 2013, Claimant presented to the hypertension clinic. (Tr. at 935). He stated that he was taking his HCTZ/Lisinopril daily as prescribed and was tolerating it well. (*Id.*). He stated that his blood pressure at home measured in the 120s/80s. (*Id.*). His blood pressure measured 135/80 at the visit, which was borderline above goal range. (Tr. at 935-36). No changes were made to his medications. (Tr. at 936). Claimant recently gained weight and was to begin dietary and lifestyle modifications, including walking every day as tolerated. (*Id.*).

On October 28, 2013, Claimant had fluoroscopic-guided lumbar epidural steroid injections at L5-S1 due to back pain. (Tr. at 926). However, the following day, Claimant reported over the telephone that the injections did not alleviate his pain at all. (Tr. at 922).

On January 9, 2014, Claimant presented to the emergency room stating that he fell and hit the back of his head two days prior and suffered headaches, neck pain, and some

nausea thereafter. (Tr. at 1254-55). No issues were noted on the CT scan of Claimant's head. (Tr. at 1020). He also had a CT scan of his cervical spine, which showed mild degenerative changes in the lower cervical spine, but no evidence of fracture or malalignment. (Tr. at 1022). He was sent home with a prescription for Toradol and he was advised that he should take the naproxen that he had at home. (Tr. at 1257).

On February 5, 2014, Claimant had a thyroid ultrasound, which revealed a solid nodule in the mid-right lobe that was not present in the previous August 30, 2013 ultrasound. (Tr. at 1019-20). The other multiple cystic and solid nodules were stable. (1020).

On March 6, 2014, Claimant had a mental health consultation in preparation for bariatric surgery. Claimant reported struggling with his weight most of his adult life and noted that his weight fluctuated between 200 and 300 pounds even while he was in the Navy. (Tr. at 1082). He was not physically active due to chronic pain. (*Id.*). His most recently recorded weight on February 27, 2014 was 299 pounds with a body mass index of 40.5. (Tr. at 1083). He was advised that he had to be nicotine free for six weeks prior to pre-bariatric surgery psychological evaluation and that he had to remain nicotine free through the date of surgery. (*Id.*). He would be tested for nicotine use on March 14 and April 25, 2014. (*Id.*).

On March 18, 2014, Claimant had an ultrasound of his abdomen during a pre-operative bariatric consultation. (Tr. at 1014-15). The ultrasound showed a solid lesion on Claimant's liver that was not seen in his chest CT scan in May 2013. (Tr. at 1015); *see* (Tr. at 593). Therefore, a CT scan of Claimant's thorax was taken for further evaluation. This CT scan showed a small density mass in the upper/middle lobe of Claimant's right lung that was stable as compared to a previous CT scan taken on October 11, 2012; severe fatty

liver infiltration without hepatomegaly (an enlarged liver); no adenopathy (large or swollen lymph nodes) in the abdomen or pelvis; and no other significant findings to suggest metastatic disease. (Tr. at 1018).

On April 2, 2014, a MRI of Claimant's abdomen was taken to evaluate the 1.6 centimeter liver mass that was seen during his above-noted visit. (Tr. at 1012-14). The appearance of the lesion on the MRI favored benign etiology. (Tr. at 1014). Thus, it was recommended that Claimant receive a repeat ultrasound in three months to ensure stability of the mass. (*Id.*). Otherwise, the MRI showed that Claimant had severe fatty liver infiltration and hepatomegaly, as well as non-specific, non-enhancing small renal cysts. (*Id.*).

On April 7, 2014, Claimant had x-rays to evaluate his various pain complaints. His shoulders showed the same early degenerative changes with no significant change from the August 10, 2012 examination. (Tr. at 1006). The x-rays of Claimant's cervical spine showed mild degenerative changes at C6-C7 that were unchanged from the August 10, 2012 radiographs, the same straightening of the normal cervical lordotic curvature, and no acute fracture or prevertebral soft tissue swelling. (Tr. at 1008). Claimant's thoracic spine x-rays showed early degenerative changes in the lower thoracic spine, but no acute fracture. (Tr. at 1009). His elbow x-rays showed no interval change in the right elbow and normal appearance in the left elbow. (Tr. at 1010).

On April 18, 2014, Claimant presented to the VA emergency room with left foot pain, most in his heel, for the past week. (Tr. at 1196-99). X-rays were taken of Claimant's left foot, which showed an unchanged small posterior calcaneal bone spur, minimal spurring of the anterior aspect of the distal tibia, and minimal degenerative changes in the second and third DIP joints. (Tr. at 1005). He was issued a straight cane and

prescribed 800 milligram ibuprofen. (Tr. at 1075, 1197). He was referred to a physical therapist for the chronic pain in his neck, back, shoulders, knees, and elbows. (*Id.*).

On May 6, 2014, Claimant presented to the hypertension clinic. His blood pressure readings were within his goal blood pressure of less than 140/80. (Tr. at 1191-92). Therefore, Claimant was discharged from the hypertension clinic to follow up with his primary care physician for future blood pressure monitoring. (*Id.*). He was advised to continue his efforts at modifying his lifestyle to include a healthy diet and exercise and he was to continue taking hydrochlorothiazide and Lisinopril. (*Id.*).

On May 13, 2014, Claimant presented for a physical therapy consultation. He presented in moderate distress with a guarded gait, decreased trunk rotation, and use of a straight cane. (Tr. at 1073). He had decreased lordosis; his range of motion was limited and painful in all ranges in both his cervical spine and trunk. (*Id.*). However, his strength and sensation were normal. (*Id.*). Tenderness to palpation was most noted at T4-7, L4-S1 region. (*Id.*). Claimant stated that he was not interested in physical therapy because it caused pain and was not helpful in the past; therefore, it was recommended that he follow up with pain management. (Tr. at 1074). He was also evaluated for occupational therapy due to his complaints of pain in his shoulders, elbows, and hands, but he was likewise considered to not be a candidate because he endorsed pain with any movement or activity and stated that therapy did not help him the past. (Tr. at 1187-88). Despite his complaints of pain, numbness, and tingling in his upper extremities, Claimant stated that he was independent in all activities of daily living. (Tr. at 1187).

On May 30, 2014, Claimant came in for a routine visit regarding his chronic conditions. He denied having any headache, chest pain, or shortness of breath, and he ambulated "ok" with no support except for a limping due to left heel pain. (Tr. at 1178).

He requested to see a podiatrist. (*Id.*). His blood pressure was 141/88. (*Id.*). For his chronic neck, back, shoulder, and extremity pain he was to continue ibuprofen until he had further evaluation via MRI. (Tr. at 1179). He was to continue metformin for type 2 diabetes**,** hydrochlorothiazide for hypertension, and diet control for his obesity. (*Id.*). He was started on colestipol for hyperlipidemia, referred to a podiatrist for heel pain, and scheduled for an abdominal ultrasound to evaluate his fatty liver. (*Id.*).

On June 13, 2014, Claimant had a MRI of his cervical spine, which showed congenital narrowing of the spinal canal with superimposed acquired stenosis from C3 through C7 and the most significant disc osteophyte complex as C6-C7; disc herniations; and mild ventral effacement of the spinal cord due to central and paracentral disc protrusions. (Tr. at 1003). The MRI of Claimant's dorsal spine did not show any significant abnormality. (Tr. at 1004). Claimant was advised of his test results and told that he could continue ibuprofen and gabapentin. (Tr. at 1173). If pain management was not effective, he could be evaluated for surgery. (Tr. at 1173-74).

On July 3, 2014, Claimant had a podiatry consultation due to left heel pain and neuroma in the third interspace of his left toes. (Tr. at 1068). Claimant's epicritic sensations were intact bilaterally, but he had heavy xerosis. (*Id.*). Claimant was advised to apply ice at night, continue ibuprofen for pain, and return to the clinic in six weeks. (*Id.*). Orthotic insoles were ordered for him. (*Id.*). Claimant also had a pain management consultation regarding pain in his neck, back, shoulder, hips, knees, and chest wall, as well as numbness and tingling in his hands and feet. (Tr. at 1058). Claimant rated the pain "7" out of "10" and stated that he suffered the above symptoms for the past four years. (*Id.*). His blood pressure was 141/88. (1061.). Shortly thereafter, on July 9, 2014, Claimant had a lumbar epidural steroid injection at L4-5. (Tr. at 1152).

On July 21, 2014, Claimant had an abdominal ultrasound, which showed that the solid lesion on his liver measured slightly bigger by tenths of a centimeter, although it was noted that some differences in size could be expected due to differences in caliper placement. (Tr. at 999). There was no change in character of the lesion. (*Id.*). Claimant also had borderline hepatomegaly caused by fatty liver infiltration, but no gallstones or biliary ductal dilation. (*Id.*).

On July 23, 2014, Claimant had an endocrinology consultation to evaluate his multinodular goiter and minimally increased RAI uptake. (Tr. at 1055). The endocrinologist stated that the issue could be due to Hashimoto's thyroiditis or an iodine deficiency. (*Id.*). The RAI uptake issue did not require further attention because Claimant's thyroid function was normal. (*Id.*). The plan was to perform thyroid function tests periodically, such as annually, to ensure that Claimant's thyroid function remained normal. (*Id.*). On the same date, Claimant was also evaluated by a neurosurgeon regarding his complaints of continued neck pain and headaches. On examination, there was no long tract findings of hyperreflexia, Hoffman, or Babinski signs. (Tr. at 1148). Based on the examination and prior radiographic findings, the neurosurgeon recommended continued radiographic and clinical surveillance. (*Id.*). Claimant requested to see a chiropractor; however, he was advised that he needed to complete his steroid injection therapy before receiving a chiropractic referral. (Tr. at 1149).

On August 5, 2014, Claimant presented to the emergency room again complaining of neck, back, and knee pain and headaches. (Tr. at 1140, 1143). For his neck and back pain, Claimant was prescribed a muscle relaxer, Zanaflex, and Etodolac, as well as scheduled for a chiropractic consultation. (Tr. at 1141). Claimant was also issued bilateral hinged knee braces due to his complaints of knee pain. (Tr. at 1049, 1141). On August 19,

2014, Claimant had EMG testing, which were compared to his 2012 testing. (Tr. at 1321). Carpal tunnel syndrome was no longer evident, but there was borderline low amplitude of his right median motor nerve with minimal motor unit changes bilaterally. (*Id.*).

On August 22, 2014, Claimant had a thyroid ultrasound, which showed that his thyroid cysts and nodules were stable. (Tr. at 997). He had multiple cystic lesions, which were most likely colloid cysts, a stable 7 millimeter nodule on the right, and a stable 6 millimeter nodule on the left. (*Id.*).

On August 25, 2014, Claimant presented to Dr. Elizabeth Martin at Westmoreland Chiropractic Center for treatment of headaches. (Tr. at 965). Claimant rated the intensity of his headaches a "10" out of "10" and stated that they bothered him constantly. (*Id.*). X-rays showed good vertebral alignment in his cervical spine, but degenerative joint and disc disease resulting in loss of joint and disc space at C3 through C7 bilaterally. (Tr. at 968). Grip strength testing suggested neuromuscular weakness on Claimant's left side; his straight-leg raising test was positive on his right side at 50 degrees in the supine position; and his cervical and lumbar range of motion was restricted. (Tr. at 963).

On October 20, 2014, Claimant had a cervical epidural steroid injection due to his cervicalgia and cervical degenerative disc disease. (Tr. at 1107). Later that year, on December 19, 2014, Claimant presented to the emergency room with bilateral hip pain that was radiating into both of his legs. (Tr. at 1096, 1098). X-rays of his hips and pelvis revealed normal results. (Tr. at 994-95, 1097). Claimant was assessed with neuropathic pain and prescribed gabapentin. (Tr. at 1097).

On January 14, 2015, Claimant had a costochondral nerve block to relieve right-sided breastplate tenderness. (Tr. at 1090-92). Claimant reported that his previous cervical spine nerve block was successful in relieving his pain for approximately one

month. (Tr. at 1093).

On March 2, 2015, Claimant had an ultrasound of his thyroid, which was compared to his previous ultrasound on August 22, 2014. (Tr. at 1355). The ultrasound showed a new solid nodule in the inferior right lobe, two solid nodules in the inferior right lobe that minimally increased in size, complex cystic structures that had slightly decreased in size, stable complex cysts in the mid right lobe, and a stable solid nodule in the upper left lobe. (Tr. at 1356). The endocrinologist advised Claimant that the ultrasound was not significantly different from the previous one and the nodules were not at the size that biopsy was indicated. (Tr. at 1371). Claimant was to be monitored annually as previously suggested. (*Id.*). On the same date, Claimant had a physical therapy consultation, but stated that he had prior bouts of seizure activity during physical therapy and preferred to continue pain management steroid injections; thus, he declined physical therapy evaluation and treatment at that time. (Tr. at 1452).

On March 13, 2015, Claimant presented to the emergency room complaining of an increase in his chronic neck pain that was radiating up the back of his head to his right eyebrow over the prior three days because he was bending repeatedly and lifting things while cleaning his basement. (Tr. at 1440). He advised that he did not lift any "heavy stuff." (*Id.*). Claimant also reported that he continued to have mid and low back pain on a chronic basis that radiated to his fingers "like lightning bolts." (*Id.*). He was taking diclofenac and gabapentin as needed. (*Id.*). On examination, he could abduct his shoulders to 90 degrees before his neck began to hurt, his bicep reflexes were 2+, his triceps reflexes were 1+, and his gait was normal. (Tr. at 1441). The impression was acute exacerbation of chronic cervicalgia and he was given a shot of Stadol. (Tr. at 1443). He was advised to resume taking a small dose of gabapentin daily before he went to bed to

see if it resulted in fewer exacerbations of pain. (*Id.*).

On April 15, 2015, Claimant received a thoracic epidural steroid injection to address pain that he was having in his mid-back that was radiating to his scapulae. (Tr. at 1426). Claimant stated that he had good results from his prior cervical epidural steroid injection and his costochondral joint injection. (Tr. at 1434).

On May 8, 2015, Claimant presented to the emergency room at the VA complaining of pain all over and requesting another Stadol injection. (Tr. at 1415, 1419). He stated that most of his joints and muscles hurt, which was a chronic problem, but the pain was worse over the previous couple of days. (Tr. at 1415). He did not have any weakness, numbness, change in function, or paresthesias. (Tr. at 1416). He was assessed to have an exacerbation of chronic pain and given a Stadol injection. (Tr. at 1418). The following month, Claimant presented to the emergency room due to his chronic neck, back, and hip pain. (Tr. at 1394). He was given Stadol and discharged home. (Tr. at 1397).

On June 13, 2015, Claimant had x-rays of his lumbosacral spine, which were compared to his x-rays taken on May 1, 2011. (Tr. at 1352). The impression was chronic spondylolysis at L5, but no spondylolisthesis, and mild degenerative changes from L4 to S1, but no fractures or significant progression from his prior x-rays. (*Id.*).

On June 14, 2015, Claimant presented to the emergency room with pain in his back and shoulder that was worse than usual. (Tr. at 1382). Claimant stated that he exerted himself that day working outside. (*Id.*). He was given Stadol and the impression was that he exacerbated his chronic pain syndrome. (Tr. at 1385). He was discharged to follow up with his primary care physician. (*Id.*).

On July 8, 2015, Claimant presented to the emergency room complaining of pain in both hips near his groin; he stated that he lifted "some things" that day and he

requested Stadol injections. (Tr. at 1688, 1692). Claimant had x-rays of his hips and pelvis that were compared to his December 19, 2014 examination. (Tr. at 1503). There was no acute fracture or dislocation and no significant arthritic process within his hips. (*Id.*). The impression was likely soft tissue tendon inflammation. (Tr. at 1691). Claimant was given toradol and solumedrol without relief and then Stadol. (*Id.*). He was to continue medications and follow up with his primary care physician. (*Id.*). He declined physical therapy, stating that it previously caused him to have a seizure. (*Id.*).

On July 9, 2015, Claimant had a CT scan of his pelvis due to his hip pain. (Tr. at 1501). Claimant had age-appropriate mild-to-moderate degenerative disc disease of the L5-S1 level, but he did not have any acute fractures or significant degenerative changes in his hips. (Tr. at 1502). Later that month, on July 13, 2015, Claimant had an injection of local anesthetic and steroids into the sacroiliac joint (the area where the spine meets the pelvis). (Tr. at 1681).

On July 20, 2015, Claimant had a repeat ultrasound of his abdomen to evaluate whether the lesion on his liver was stable. (Tr. at 1499). There was slight interval increase from the prior examination; therefore, a follow-up CT or MRI was recommended for further evaluation. (Tr. at 1500). The CT scan of his abdomen, taken on September 2, 2015, showed that the nodule in his liver had not changed in size or characterizes since 2014. (Tr. at 1499). Claimant's fatty infiltrated liver and small renal cysts were also unchanged. (*Id.*). The radiologist advised that the lesion was most likely benign and might represent a focal nodular hyperplasia (benign tumor of the liver). (Tr. at 1624).

On August 21, 2015, Claimant presented to the VA stating that he had pain "all over" his body and that every step hurt. (Tr. at 1665). His gait was antalgic and he was using an assistive device. (Tr. at 1668). For his hip pain, he was referred to physical

therapy; he was advised to quit smoking; for his thyroid nodule, he was referred to endocrinology; for his GERD, he was told to stop Zantac and try PPI; for his chronic pain disorder, he was referred to acupuncture and physical therapy; and for his muscle spasms, he was to continue tizanidine. (Tr. at 1669).

On August 26, 2015, Claimant had an endocrinology consultation, which revealed that Claimant's thyroid function tests were normal and Claimant's thyroid showed minimal changes over the past six months and were mainly cystic disease. (Tr. at 1551-52). Claimant did not have any cysts or nodules that were at the size indicated for a fine needle aspiration. (1552.). The plan was to repeat Claimant's ultrasound in one year and if it remained stable, then repeat it every two to five years because there was low risk of malignancy given the stability over three years. (*Id.*).

On September 2, 2015, a CT scan was taken of Claimant's abdomen to evaluate whether there were any changes in the liver nodule seen in 2014. (Tr. at 1498). The nodule had not changed in size or characterizes since 2014. (Tr. at 1499). Claimant also had fatty infiltrated liver and small renal cysts that were unchanged. (*Id.*). The radiologist advised that the lesion was most likely benign and might represent a focal nodular hyperplasia. (Tr. at 1624).

The following day, on September 3, 2015, Claimant reported that he was in a motor vehicle collision in April in which he was driving and he was t-boned on the driver's side of the car by a vehicle traveling around 90 miles per hour. (Tr. at 1553). He reported that pain injections provided several weeks of relief. (*Id.*). He agreed to a physical therapy plan. (Tr. at 1557-58).

On September 6, 2015, Claimant presented to the emergency room reporting a flare-up of his chronic neck, shoulder, and back pain. (Tr. at 1622). He walked with a

slightly stiff gait and also had a cough, congestion, and headache. (Tr. at 1623). Additional chest x-rays were taken on September 6, 2015 due to his continued wheezing and coughing. (Tr. at 1497). There was no radiographic evidence of acute cardiopulmonary disease. (*Id.*).

On September 17, 2015, Claimant returned for acupuncture treatments to treat his various pain complaints. (Tr. at 1565-70). Claimant was to see how he responded to the treatment and call if he wished to schedule follow up treatments. (Tr. at 1570). Claimant was advised that it might take several acupuncture treatments before the effects provide lasting relief. (Tr. at 1597). A few days later, on September 21, 2015, Claimant had a thyroid ultrasound. (Tr. at 1495). The results were stable as compared to his ultrasound on March 2, 2015. (*Id.*).

On October 13, 2015, Claimant presented to the emergency room for continued coughing and congestion for a month despite taking antibiotics. (Tr. at 1588). Claimant had chest x-rays because he reported having cough and congestion for one month. (Tr. at 1494). The results were normal and did not show any active disease. (*Id.*).

On October 21, 2015, Claimant presented to the emergency room at the VA for persistent coughing that did not respond to two courses of antibiotics, nebulizer inhalers, or steroids. (Tr. at 1578). Chest x-rays were ordered due to Claimant's pneumonia, cough, congestion, sore throat, and sneezing. (Tr. at 1493). The results were normal without any change from his prior x-rays taken on October 13, 2015. (*Id.*). Claimant was given several medications and discharged. (Tr. at 1582-83).

On October 26, 2015, Claimant had a CT angiography of his chest to evaluate his pleuritic chest pain. (Tr. at 1492). There was no significant change in comparison to his prior examination on March 18, 2014. (*Id.*). There was again no evidence of a pulmonary

embolism. (*Id*.).

### C. Evaluations and Opinion Evidence

On October 15, 2013, Robert Weisberg, D.O., evaluated Claimant's RFC based upon a review of his records. Dr. Weisberg found Claimant to be only partially credible on the basis of his activities of daily living, treatment by medication, and other forms of treatment. (Tr. at 129). He found that Claimant could perform light level work; sit, stand, or walk for a total of 6 hours in an 8-hour work day; frequently climb ramps/stairs and balance; occasionally stoop, kneel, crouch, or crawl; and never climb ladders/ropes/scaffolds. (Tr. at 130). Claimant should avoid concentrated exposure to temperature extremes, wetness, and vibration and avoid even moderate exposure to hazards. (Tr. at 131). On December 31, 2013, A. Rafael Gomez, M.D., reviewed all of the evidence in the file, including Claimant's allegations that his neck, back, and chest pain and headaches were getting worse, and affirmed the RFC assessment as written. (Tr. at 135-44).

On January 29, 2014, Claimant had a psychological evaluation by Monica McMillian, M.A., for the West Virginia Disability Determination Service. He had no impairment in his gait and posture and Claimant reported that he drove approximately 35 to 40 minutes to the evaluation. (Tr. at 947). His appearance, social activity, speech, orientation, thought processes and content, insight, immediate memory, and psychomotor behavior were within normal limits. (Tr. at 950). However, his recent memory and concentration were mildly deficient. (Tr. at 950). Ms. McMillian opined that Claimant suffered from adjustment disorder with mixed anxiety and depressed mood based upon Claimant's reported symptoms and history. (*Id*.). His social functioning, persistence, and pace were all within normal limits. (Tr. at 951). His prognosis was fair,

but Ms. McMillian found that Claimant could not manage his own finances, if he was granted benefits, as he reported misplacing bills, unable to manage his finances, and was one year behind on his house payment. (*Id.*).

On February 11, 2014, agency psychologist Joseph Richard assessed Claimant's mental RFC based upon a review of his records. He found Claimant to be moderately limited in understanding, remembering, and carrying out detailed instructions, maintaining attention and concentration for extended periods, and interacting appropriately with the general public. (Tr. at 155-56). Mr. Richard found that Claimant's statements were reasonably consistent with the medical evidence of record. (Tr. at 156). He reported depression and anxiety related to injury with no mental health treatment. (*Id.*). His immediate recall memory was within normal limits, but he had mild deficits in remote memory and concentration with good persistence and pace. (*Id.*). He had good social skills, but did not feel comfortable around others. (*Id.*). Overall, Mr. Richard stated that Claimant had the RFC to work in a low-stress environment on 2 to 3 step tasks with minimal contact with the public and accommodations for his physical limitations. (*Id.*).

On October 17, 2014, Jimmy W. Adams, D.O., completed a series of disability benefits questionnaires for the VA. Regarding Claimant's hip and thigh conditions, Claimant stated that he began having pain in the anterior aspect of both hips ten years prior when he fell down ten steps carrying a drill press. (Tr. at 1286). He had no issues with range of motion, functional loss, or functional impairment. (Tr. at 1287-90). Claimant also did not have pain on palpation, loss of muscle strength, or ankylosis. (Tr. at 1291-92). He did not use an assistive device as a normal mode of locomotion. (Tr. at 1294). Overall, Dr. Adams stated that his hip and/or thigh condition did not impact Claimant's ability to work. (Tr. at 1295). Dr. Adams also completed a questionnaire

regarding Claimant's bilateral patellofemoral syndrome. (Tr. at 1296-1305). Claimant reported that his knees were also injured when he fell down stairs carrying a drill press because the drill press "came down on his knees." (Tr. at 1296). His flexion was limited at 90 degrees and painful motion began at 85 degrees (normal endpoint was 140 degrees) in both knees. (Tr. at 1297-98). He had no limitation or pain on extension in his right knee. (*Id.*). Claimant was in too much pain to perform repetitive testing. (Tr. at 1298). Claimant had interference with movement, locomotion, sitting, standing, and weight bearing in both knees. (Tr. at 1299). He also had pain and increased fatigability. (*Id.*). His muscle strength was 4/5 (active movement against some resistance) in both knees, but normal joint stability. (Tr. at 1300). Dr. Adams opined that Claimant's knee and lower leg conditions limited him to lifting 10 pounds, walking 10 feet at one time and 10 feet total in an 8-hour workday, and standing for 10 minutes at one time before needing to rest. (Tr. at 1304-05). He had no limitation in sitting. (*Id.*).

Regarding Claimant's diagnosis of lumbar strain, Claimant stated that he reported pain in 1995, the year following his drill press injury, but he was ignored and did not start receiving treatment for it until 2012. (Tr. at 1306). He currently had pain from the base of his skull down to his tailbone and had received injections for the pain. (*Id.*). He had limited forward flexion of 30 degrees (normal endpoint is 90 degrees) and painful motion began at 25 degrees. (Tr. at 1307). His extension ended at 10 degrees (normal endpoint is 30 degrees) and painful motion began at 5 degrees. (*Id.*). Lateral flexion and rotation on both sides ended at 20 degrees (normal endpoint is 30 degrees) and painful motion began at 15 degrees. (Tr. at 1307-08). Claimant could not perform repetitive testing due to pain. (Tr. at 1308). Claimant had tenderness to palpation in his mid-back paraspinal muscles. (Tr. at 1309). He had guarding and/or muscle spasm in his thoracolumbar spine, but it

did not result in abnormal gait or spinal contour. (*Id.*). He had normal muscle strength except limited right knee extension of 4/5. (Tr. at 1310). He had no muscle atrophy, normal reflex and sensory examination, negative straight leg raising tests, no radicular pain or symptoms, no other neurological abnormalities. (Tr. at 1310-12). (*Id.*).

On April 21, 2015, Claimant's VA disability ratings were increased. He was assigned 10 percent service connected disability for radiculopathy in each of his legs, he was newly assigned 10 percent service connected disability for strain in each of his hips, and his ratings of 40 percent for lumbar strain and 10 percent for patellofemoral pain syndrome in his knees were continued. (Tr. at 452-55). Claimant's overall combined VA disability rating was increased from 50 to 70 percent. (Tr. at 456).

On August 24, 2015, Thomas R. Poskitt, M.D., examined Claimant and completed a series of disability benefits questionnaires. In Claimant's right hip, his range of motion was limited in all directions. His flexion was limited to 60 degrees (normal is 125 degrees), extension was 10 degrees (normal is 30 degrees), abduction was 25 degrees (normal is 45 degrees), adduction was 15 degrees (normal is 25 degrees), external rotation was 30 degrees (normal is 60 degrees), and internal rotation was 30 degrees (normal is 40 degrees). (Tr. at 1634). In his left hip, there was also limited range of motion in all directions and the restriction was slightly worse than his right hip. Flexion was limited to 40 degrees (normal is 125 degrees), extension was 10 degrees (normal is 30 degrees), abduction was 20 degrees (normal is 45 degrees), adduction was 15 degrees (normal is 25 degrees), external rotation was 20 degrees (normal is 60 degrees), and internal rotation was 30 degrees (normal is 40 degrees). (Tr. at 1635). He could cross his legs, but could not squat and had difficulty rising from deep chairs. (Tr. at 1634-35). There was evidence of pain with weight bearing, but no localized tenderness or pain on palpation or evidence

of crepitus. (*Id.*). Claimant was in too much pain to perform repetitive testing of either hip. (Tr. at 1636). He did not have any reduction in muscle strength, muscle atrophy, or ankylosis of either hip. (Tr. at 1637-38). Claimant regularly used a cane to reduce pressure on his hips and reduce pain. (Tr. at 1639). Dr. Poskitt stated that Claimant could not work as a machinist because he could not squat down to work. (Tr. at 1640).

Claimant was rated 10 percent service-connected disabilities for degenerative joint disease and patellofemoral pain syndrome in his legs. (Tr. at 1642). His right knee flexion was 0-105 degrees (normal is 0-140 degrees), extension was 105-0 degrees (normal is 140-0 degrees), but there was no evidence of pain with weight bearing, tenderness or pain on palpation, or crepitus. (Tr. at 1642-43). His left knee flexion was 0-110 degrees (normal is 0-140 degrees), extension was 110-0 degrees (normal is 140-0 degrees), but there was no evidence of pain with weight bearing, tenderness or pain on palpation, or crepitus. (Tr. at 1643). Claimant could perform repetitive testing without any functional or range of motion loss after three repetitions. (*Id.*). He had no reduction in muscle strength or ankylosis. (Tr. at 1645). There was no joint instability. (Tr. at 1646-47). Claimant regularly used a cane to relieve pressure on his knees and knee braces for stability. (Tr. at 1648). Dr. Poskitt found that these conditions did not impact Claimant's ability to perform any type of occupational task. (Tr. at 1649).

Regarding Claimant's back conditions, Claimant had limited forward flexion of 40 degrees (normal endpoint is 90 degrees), extension ended at 20 degrees (normal endpoint is 30 degrees), right lateral flexion of 20 degrees and left lateral flexion of 10 degrees (normal endpoint is 30 degrees), and lateral rotation on both sides of 25 degrees (normal endpoint is 30 degrees). (Tr. at 1651). The range of motion limitations rendered Claimant unable to bend over and pick objects up from the floor or lift more than 15 pounds. (*Id.*).

Claimant was in too much pain for repetitive testing. (Tr. at 1652). He had normal muscle strength, no muscle atrophy, normal reflexes, and normal sensory examination. (Tr. at 1653-54). He could not perform the straight leg raise test. (Tr. at 1654). He had constant moderate radicular pain and severe paresthesias and/or dysesthesias and numbness in his lower extremities. (Tr. at 1654-55). The nerve root involved was his L4 through S3 nerve roots (sciatic nerve). (Tr. at 1655). Claimant regularly used a cane for stability. (Tr. at 1655-56). The thoracolumbar spine conditions rendered Claimant unable to bend to pick up objects from the floor and he had to cease working as a machinist in 2009 in part due to back pain and reduced range of motion. (Tr. at 1658). Regarding Claimant's peripheral nerve conditions, Claimant had moderate incomplete paralysis caused by his sciatic nerve on both sides. (Tr. at 1662).

On November 18, 2015, board-certified orthopedic surgeon Arthur Brovender, M.D., testified at Claimant's supplemental administrative hearing. Dr. Brovender opined that based upon his review of Claimant's records, Claimant was capable of sitting, standing, or walking for six hours in an 8-hour day. (Tr. at 54-55). He further stated that he could not find any notation in the medical record in which Claimant was prescribed a cane, nor did he see any findings that would have caused him to prescribe Claimant a cane. (Tr. at 55). As to Claimant's complaints of radiating numbness and pain, Dr. Brovender stated that the medical record did not support Claimant's complaints because there would be evidence that a nerve root was being compromised such that there was damage to the nerve, which would result in muscle atrophy or weakness, reflex changes, and/or sensory changes, which were not reflected in Claimant's file. (Tr. at 66). Also, Dr. Brovender stated that pain from costochondritis does not radiate into one's shoulders and arms, as Claimant claims; it is located in the chest. (*Id.*). Overall, Dr. Brovender testified

that Claimant's subjective pain complaints, as compared to the objective findings, "just doesn't compute." (*Id.*).

### D. New Evidence Submitted to Appeals Council

On May 7, 2016, Claimant was examined by Paul W. Craig, II, M.D., for a social security RFC evaluation at the request of Claimant's counsel. Dr. Craig stated that Claimant's musculoskeletal problems included moderate to severe degenerative disc disease and osteoarthritis of the cervical and lumbosacral spine. (Tr. at 7). His cervical spine abnormalities were severe congenital and acquired spinal stenosis and multilevel disc herniations. (*Id.*). On physical examination, Claimant had markedly limited range of motion in his cervical and lumbosacral spine with marked segmental dysfunction, which were anatomical and due to pain. (*Id.*). Claimant also suffered from chronic bilateral knee pain due to patellofemoral inflammation, which, along with his spinal conditions, was expected to progressively worsen over time. (*Id.*). Dr. Craig stated that Claimant further suffered from hepatic steatosis with increased liver enzymes, which were indicative of hepatic dysfunction that is often progressive and can lead to liver failure. (*Id.*). His hypertension was not well controlled and was 160/106 during the examination and he also suffered from morbid obesity, type 2 diabetes mellitus, and obstructive sleep apnea. (*Id.*). Dr. Craig opined that the combination of impairments made it impossible for Claimant to work a normal full-time job and his RFC was in the sedentary range. (*Id.*). Dr. Craig stated that Claimant could not reasonably be expected to compete in the job market with his limitations and conditions. (*Id.*). Further, Claimant had depression due to his pain, limitations, and inability to work for which he took medication. (*Id.*). Dr. Craig opined that Claimant could lift or carry no more than 10 pounds and could not carry any amount of weight occasionally or frequently. (Tr. at 8). Claimant could stand or walk for

one to two hours, but could only walk or stand for less than an hour without interruption and must use a cane when ambulating. (Tr. at 9). Claimant could sit for four to five hours total, but for only one to two hours without interruption. (*Id.*). He could never perform postural activities except that he could rarely stoop. (*Id.*). He was limited in reaching and pushing/pulling due to his neck and upper extremity deficits and low back pain. (Tr. at 10). Further, Dr. Craig stated that it would be unsafe for Claimant to work in any industry or environment due to his physical limitations. (*Id.*).

On July 5, 2016, the Department of Veterans Affairs sent Claimant a letter regarding its decision as to Claimant's entitlement to VA benefits. Claimant was notified that he was granted individual unemployability as of April 21, 2015 because he was "unable to secure or follow a substantially gainful occupation as a result of service-connected disabilities." (Tr. at 1708). The VA increased Claimant's service-connected disability rating for Claimant's lower extremity radiculopathy in both legs from 10 to 20 percent. (Tr. at 1708). Overall, Claimant's combined service-connected disability rating was increased from 70 to 80 percent. (Tr. at 1711).

### E. New Evidence Submitted to the Court

On January 5, 2017, Claimant had a MRI at the VA, which noted that the lesion on the left lobe of Claimant's liver did not follow the typical characteristics of hepatic malignancy on MRI. (ECF No. 10-2 at 6). However, because the now 2-centimeter lesion had increased in size, it was biopsied shortly thereafter, on January 13, 2017, at Cabell Huntington Hospital. (*Id.*). The biopsied tissue from Claimant's liver revealed poorly differentiated carcinoma that favored adenocarcinoma. (*Id.*). The specimen was also sent to the Mayo Clinic, which confirmed that Claimant likely had primary cholangiocarcinoma. (*Id.*).

On February 14, 2017, Claimant saw Dr. Kimmey at HIMG for evaluation of his liver cancer. Dr. Kimmey recorded that Claimant reported abnormalities in his liver dating as far back as 2013 and records from 2014 documented a lesion on his liver. (ECF No. 10-3 at 10). Claimant stated to Dr. Kimmey that he had some abdominal discomfort for some time and his current symptoms included intermittent nausea and vomiting, occasional diarrhea, and occasional rectal bleeding. (*Id.*). Claimant had lost approximately 25 pounds. (*Id.*). Dr. Kimmey stated that the history of Claimant's liver lesion would suggest that it had been growing slowly, although the histology suggested a generally faster growing tumor. (*Id.* at 12). Claimant's PET scan was normal, which could be expected with a slow-growing cancer without a high metabolic rate. (*Id.*). Dr. Kimmey was concerned regarding metastatic spread, as there were new lesions in Claimant's lung. (*Id.*). Claimant was scheduled to see a surgical oncologist. Dr. Kimmey stated that surgery was certainly a possibility, although he was concerned that the lung lesions indicated metastatic spread, which could eliminate that option. (*Id.* at 13).

The following day, on February 15, 2017, Claimant saw surgical oncologist Amanda K. Arrington, M.D., at the Edwards Comprehensive Cancer Center. Dr. Arrington likewise noted that Claimant's liver lesion was seen on ultrasound dating back to 2014. (ECF No. 10-4 at 4). The liver lesion currently measured approximately 2 to 2.5 centimeters in diameter. (*Id.*). Dr. Arrington stated that the lesion could have been benign initially and then transformed into cancer. (*Id.* at 7). However, Dr. Arrington noted that the histology was concerning for a more aggressive phenotype. (*Id.*). Dr. Arrington agreed with Dr. Kimmey that the lung lesions were concerning for metastasis. (*Id.*). Therefore, Claimant was scheduled for a repeat chest CT scan in two to three weeks to evaluate whether the lung lesions were changing. (*Id.*).

On March 24, 2017, agency physician Dr. Osborne reviewed Claimant's records for the purpose of evaluating his application for disability benefits filed on January 11, 2017. Like Claimant's physicians, Dr. Osborne made a note of the fact that Claimant's liver lesion was seen in his ultrasound in March 2014, in his CT scan in September 2015, and mentioned again in December 2016. (10-2 at 7). Therefore, Dr. Osborne found that "Claimant [had] liver cancer earlier than [the] biopsy date" in January 2017. (*Id.* at 7). Dr. Osborne recommended amending Claimant's alleged onset date of December 18, 2012 to January 27, 2016 because it was the day after the ALJ's decision on Claimant's prior application. (*Id.* at 9). Dr. Osborne found that Claimant met the listing criteria for Listing 13.19 (Cancer of the liver, gallbladder, or bile ducts) as of January 27, 2016. (*Id.* at 8).

## VI.    Scope of Review

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In Blalock v. Richardson, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Instead, the Court's role is limited to insuring that the ALJ followed applicable Regulations and Rulings in reaching his decision, and that the decision is

supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

**VII.** <u>**Discussion**</u>

**A. The ALJ's RFC Analysis and Finding**

Claimant challenges the ALJ's RFC analysis and finding on numerous accounts. Claimant contends that the ALJ failed to properly consider the medical source opinions and evidence in the matter, including the opinions of Jimmy Adams, D.O, and Monica McMillan, M.A. and the 70 percent service-connected disability award rendered by the VA. (ECF No. 6 at 5-7). Claimant also argues that the ALJ did not properly evaluate his credibility, stating that his credibility "should not have come into question" considering the record. (*Id.* at 6-7). Further, Claimant challenges the fact that the ALJ did not accept the testimony of the vocational expert that there were no jobs in the national economy for an individual who is off task 10 percent of the workday or absent one or more days per month. (*Id.* at 7). The undersigned addresses each argument in turn.

*1. Medical Source Opinions*

Claimant asserts that the ALJ "failed to fairly consider medical source opinions" in his case. (ECF No. 6 at 5). He calls attention to the opinion of Dr. Adams, who performed a one-time consultative examination of Claimant in October 2014 to determine Claimant's eligibility for VA disability benefits, and the opinion of psychologist Ms. McMillian, who evaluated Claimant in January 2014 with respect to his application for social security disability benefits. (*Id.* at 5-6).

When evaluating a claimant's application for disability benefits, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the

relevant evidence [he] receives." 20 C.F.R. § 404.1527(b) (2012).[3] Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite [his] impairment(s), and [his] physical or mental restrictions." *Id.* § 404.1527(a)(2).

The regulations outline how the opinions of accepted medical sources should be weighed in determining whether a claimant qualifies for disability benefits. *Id.* § 404.1527(c). In general, the ALJ should give more weight to the opinion of an examining medical source than to the opinion of a non-examining source, and even greater weight to the opinion of a treating physician, because that physician is usually most able to provide a detailed, longitudinal picture of a claimant's alleged disability. *Id.* § 404.1527(c)(1)-(2).

Medical source statements on issues reserved to the Commissioner are treated differently than other medical source opinions. SSR 96-5p, 1996 WL 374183 (S.S.A. 1996). In both the regulations and SSR 96-5p, the SSA explains that "some issues are not medical issues regarding the nature and severity of an individual's impairment(s) but are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability;" including the following:

1. Whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings;

2. What an individual's RFC is;

---

[3] This section and other sections of the social security regulations cited within this Proposed Findings and Recommendation were revised effective March 27, 2017. However, the undersigned applies the law that was in effect at the time of the ALJ's decision.

3. Whether an individual's RFC prevents him or her from doing past relevant work;

4. How the vocational factors of age, education, and work experience apply; and

5. Whether an individual is "disabled" under the Act.

*Id.* at *2. "The regulations provide that the final responsibility for deciding issues such as these is reserved to the Commissioner." *Id.* As such, a medical source statement on an issue reserved to the Commissioner is never entitled to controlling weight or special significance, because "giving controlling weight to such opinions would, in effect, confer upon the [medical] source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine when an individual is disabled." *Id.* at *2. Still, these opinions must always be carefully considered, "must never be ignored," and should be assessed for their supportability and consistency with the record as a whole. *Id.* at *3.

In this case, the ALJ explicitly considered the opinions of Dr. Adams and Ms. McMillan and weighed them in accordance with Social Security rules and regulations. Claimant contends that the ALJ "inexplicably" gave Dr. Adams's opinion little weight, but failed to "reasonably justify this conclusion." (ECF No. 6 at 6). The undersigned disagrees with this contention. The ALJ recognized Dr. Adams's opinion that Claimant could only lift ten pounds, walk ten feet, and stand for ten minutes. (Tr. at 25). However, the ALJ noted that during the disability examination, Claimant's sensory and straight leg testing was negative and Dr. Adams noted no radicular pain; accordingly, the ALJ concluded that the limitations expressed by Dr. Adams appeared to be based largely on Claimant's subjective guarding, pain, and exhaustion during the single examination and the ALJ gave

the opinion little weight. (*Id.*).

The ALJ clearly fulfilled his obligation to consider and weigh Dr. Adams's opinion in comparison to the evidence in the record. Indeed, although Dr. Adams found that Claimant suffered from some limitations related to his back and knee conditions, Dr. Adams found that Claimant had no muscle atrophy, normal reflexive and sensory examination, negative straight leg raising tests, no radicular pain or symptoms, and no other neurological abnormalities on examination. (Tr. at 1310-12). Also, and very critically, the ALJ's discussion of Dr. Adams's opinion occurred within the context of the ALJ's extensive analysis and discussion of Claimant's allegations, medical treatment, and the various opinions offered in this case. (Tr. at 20-26). The ALJ compared and weighed all of the evidence and ultimately found the record lacked objective evidence through diagnostic studies or examination findings to corroborate Claimant's alleged limitations and pain from his spinal and joint conditions. (Tr. at 21). In fact, the ALJ further sought the opinion of Dr. Brovender, a board-certified orthopedic surgeon, who likewise reviewed all of Claimant's records and testified at the supplemental hearing in November 2015 that if Claimant was experiencing radiating numbness and pain in his body as he alleged, there would be objective evidence, such as muscle atrophy or weakness or reflex or sensory changes, to demonstrate that a nerve root was being compromised. (Tr. at 66). However, Dr. Brovender stated that such evidence was not reflected in Claimant's file and his subjective complaints as compared to the objective findings "just doesn't compute." (*Id.*). Ultimately, based on Dr. Brovender's testimony and his analysis of all of other evidence, the ALJ performed his role as adjudicator in weighing Dr. Adams's opinion and providing the limitations assessed by Dr. Adams little weight.

Next, as to Ms. McMillian's opinion, Claimant does not specify any error

committed by the ALJ with respect to this evidence. (ECF No. 6 at 6). The ALJ gave significant weight to Ms. McMillian's consultative psychological examination report. (Tr. at 19). As noted by the ALJ, Ms. McMillian found nothing more than mild functional limitations as a result of Claimant's mental health symptoms. (Tr. at 19, 950-51).

Therefore, looking specifically at the opinions of Dr. Adams and Ms. McMillan, the undersigned **FINDS** that the ALJ properly examined each of these medical source statements, weighed them, and provided clear explanations for the weight given to them. The ALJ supplied references to the evidence to clarify and support his conclusions regarding the weight he gave to the opinions.

### 2. VA Ratings

Claimant next argues that the ALJ "failed to explain in any meaningful manner why he gave 'little weight overall' to the 70% service connected disability award rendered by the [VA]." (ECF No. 6 at 7). Claimant contends that the ALJ failed to discuss and consider the impact of *Bird v. Commissioner of Soc. Sec.*, 699 F.3d 337 (4th Cir. 2012) in in his decision-making process. (*Id.*).

In *Bird,* the Fourth Circuit discussed the role that VA disability ratings should play in the SSA's disability determination process. To begin, the Fourth Circuit confirmed the basic rule that other agency decisions, while not binding on the SSA, "cannot be ignored and must be considered" when evaluating a claimant's eligibility for social security disability benefits. *Id.* at 343 (citing *DeLoatche v. Heckler*, 715 F.2d 148, 150 n. 1 (4th Cir. 1983) and SSR 06-03p, 2006 WL 2329939, at *6 (Aug. 9, 2006)).[4] With respect to the

---

[4] SSR 06-03p provides, in relevant part, that while disability is an administrative finding reserved to the Commissioner, the SSA must consider disability decisions by other governmental and nongovernmental agencies. As such, evidence of a disability decision by another agency cannot be ignored and must be analyzed when determining Social Security benefits.

VA, the Fourth Circuit acknowledged that it had never explicitly addressed the precise weight the SSA should afford to VA disability ratings. Reviewing the law of other jurisdictions, the Fourth Circuit pointed out that varying degrees of deference had been given to the VA's determinations. The Fourth Circuit reasoned that even though courts differed on the amount of weight to give, "[t]he assignment of at least some weight to a VA disability determination reflects the fact that both the VA and Social Security programs serve the same governmental purpose of providing benefits to persons unable to work because of a serious disability." *Id.* The Court added, "[b]oth programs evaluate a claimant's ability to perform full-time work in the national economy on a sustained and continuing basis; both focus on analyzing a claimant's functional limitations; and both require claimants to present extensive medical documentation in support of their claims." *Id.* (citing *McCartey v. Massanari,* 298 F.3d 1072, 1076 (9th Cir. 2002)). Noting that "the purpose and evaluation methodology of both programs are closely related," the Fourth Circuit concluded that "a disability rating by one of the two agencies is highly relevant to the disability determination of the other agency." *Id.* Consequently, the Fourth Circuit mandated as follows:

> [I]n making a disability determination, the SSA must give substantial weight to a VA disability rating. However, because the SSA employs its own standards for evaluating a claimant's alleged disability, and because the effective date of coverage for a claimant's disability under the two programs likely will vary, an ALJ may give less weight to a VA disability rating when the record before the ALJ clearly demonstrates that such a deviation is appropriate.

*Id.*

Here, the ALJ stated that he "considered the opinions and statements regarding the claimant's functioning and disability provided by the Veteran's Administration." (Tr. at 25). The ALJ noted Claimant's disability ratings from the VA, including his April 2015

rating of 70 percent overall service connected disability, but the ALJ stated that he gave the rating little weight as "they are based on standards different from those within this Agency" and did "not illustrate the claimant's overall ability to perform work related activity under this Agency's standards." (Tr. at 25).

The Commissioner argues that the Fourth Circuit's ruling in *Bird* does not warrant remand where the record actually contains medical evidence from the relevant period, which shows that a deviation from the VA rating is warranted. (ECF No. 7 at 11). The Commissioner distinguishes this matter from *Bird* on the basis that the ALJ "discussed the relevant evidence at great length" and explained his reasons for affording the VA rating little weight. (*Id.*). The undersigned does not find these arguments to be persuasive.

The ALJ's cursory disregard of Claimant's VA ratings does not pass muster under *Bird*. "Under *Bird,* substantial weight is the starting point for VA disability determinations." *Dingess v. Colvin*, No. 2:15-CV-09640, 2016 WL 4004725, at *17 (S.D.W. Va. June 3, 2016), *report and recommendation adopted,* 2016 WL 4005922 (S.D.W. Va. July 25, 2016). Yet, the ALJ's decision does not provide any evidence that he applied such presumption in his analysis. Moreover, the ALJ did not point to any *evidence* in the record that clearly supported his decision to deviate from the substantial weight presumption. "The Fourth Circuit has now made it clear that the ALJ must give the VA's disability determination 'substantial weight.' If the opinion does not, then it must be evident from the opinion itself why the ALJ departed from that standard." *Jackson v. Colvin*, No. 2:14-CV-14508, 2015 WL 3466307, at *15 (S.D.W. Va. May 4, 2015), *report and recommendation adopted,* No. 2:14-CV-14508, 2015 WL 3467907 (S.D.W. Va. June 1, 2015) (citing *Wyche v. Colvin,* No. 4:13–cv–43, 2014 WL 1903106, at *10 (E.D.Va. Apr. 30, 2014) (collecting cases)). "A court may not guess at what an agency meant to say, but

must instead restrict itself to what the agency actually did say." *Id.*

Therefore, despite the Commissioner's argument that the ALJ "discussed the relevant evidence at great length," the ALJ did not apply such findings to support his decision to deviate from the presumption that Claimant's VA ratings were entitled to substantial weight. An ALJ is obligated to afford even partial VA disability ratings, such as in this case, substantial weight or provide sufficient explanation for the diminished value attributed to the ratings. *Castle v. Colvin*, No. 2:15-CV-15251, 2016 WL 7664247, at *14 (S.D.W. Va. Dec. 14, 2016), *report and recommendation adopted,* No. CV 15-15251, 2017 WL 73935 (S.D.W. Va. Jan. 6, 2017). Here, the ALJ's austere statement that Claimant's VA ratings are entitled to little weight because they were based upon different standards than those applied by the SSA appears to discount the *Bird* ruling altogether. While procedural perfection is not required, the Court is not charged with parsing through the ALJ's discussion of the evidence in order to construct the ALJ's arguments for him; "[o]therwise, the court would be forced to perform the analysis that should have been done by the ALJ in the first place." *Castle*, 2016 WL 7664247, at *15. Accordingly, the undersigned **FINDS** that this action must be remanded to the Commissioner so that the ALJ can properly carry out the statutory function of evaluating Claimant's VA disability ratings.

### 3. Credibility

Claimant next argues that it is "obvious" that his allegations of disability are valid when the evidence of record is considered in its totality and Claimant's credibility "should not have even come into question." (ECF No. 6 at 6). Claimant contends that the ALJ "impugned [his] veracity," which is "galling and disrespectful of the Honorably Discharged [Claimant]." (*Id.*).

Pursuant to 20 C.F.R. § 404.1529 (2011), the ALJ evaluates a claimant's report of symptoms using a two-step method. First, the ALJ must determine whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's symptoms, including pain. 20 C.F.R. § 404.1529(a). In other words, "an individual's statements of symptoms alone are not enough to establish the existence of a physical or mental impairment or disability." Social Security Ruling ("SSR") 16-3p, 2016 WL 1119029, at *2. Instead, there must exist some objective "[m]edical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques" which demonstrate "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. § 404.1529(b).

Second, after establishing that the claimant's conditions could be expected to produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id.* § 404.1529(a). If the intensity, persistence, or severity of the symptoms cannot be established by objective medical evidence, the ALJ must consider "other evidence in the record in reaching a conclusion about the intensity, persistence, and limiting effects of an individual's symptoms," including a claimant's own statements. SSR 16-3p, 2016 WL 1119029, at *5-*6. In evaluating a claimant's statements regarding his or her symptoms, the ALJ will consider "all of the relevant evidence," including (1) the claimant's medical history, signs and laboratory findings, and statements from the claimant, treating sources, and non-treating sources, 20 C.F.R. § 404.1529(c)(1); (2) objective medical evidence, which is obtained from the application of

medically acceptable clinical and laboratory diagnostic techniques, *id.* § 404.1529(c)(2); and (3) any other evidence relevant to the claimant's symptoms, such as evidence of the claimant's daily activities, specific descriptions of symptoms (location, duration, frequency and intensity), precipitating and aggravating factors, medication or medical treatment and resulting side effects received to alleviate symptoms, and any other factors relating to functional limitations and restrictions due to the claimant's symptoms. *Id.* § 404.1529(c)(3); *see also Craig*, 76 F.3d at 595; SSR 16-3p, 2016 WL 1119029, at *4-*7. In *Hines v. Barnhart*, the Fourth Circuit stated that:

> Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges he suffers.

453 F.3d at 565 n.3 (citing *Craig*, 76 F.3d at 595). The ALJ may not reject a claimant's allegations of intensity and persistence solely because the available objective medical evidence does not substantiate the allegations; however, the lack of objective medical evidence may be one factor considered by the ALJ. SSR 16-3p, 2016 WL 1119029, at *5.

SSR 16-3p provides further guidance on how to evaluate a claimant's statements regarding the intensity, persistence, and limiting effects of his or her symptoms. For example, the Ruling stresses that the consistency of a claimant's own statements should be considered in determining whether a claimant's reported symptoms affect his or her ability to perform work-related activities. *Id.* at *8. Likewise, the longitudinal medical record is a valuable indicator of the extent to which a claimant's reported symptoms will reduce his or her capacity to perform work-related activities. *Id.* A longitudinal medical record demonstrating the claimant's attempts to seek and follow treatment for symptoms

may support a claimant's report of symptoms. *Id.* On the other hand, an ALJ "may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record," where "the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints," or "the individual fails to follow prescribed treatment that might improve symptoms." *Id.*

Ultimately, "it is not sufficient for [an ALJ] to make a single, conclusory statement that 'the individual's statements about his or her symptoms have been considered' or that 'the statements about the individual's symptoms are (or are not) supported or consistent.' It is also not enough for [an ALJ] simply to recite the factors described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the [ALJ] evaluated the individual's symptoms." *Id.* at *9. SSR 16-3p instructs that "[t]he focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person;" rather, the core of an ALJ's inquiry is "whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and given the adjudicator's evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities." *Id.* at *10.

When considering whether an ALJ's evaluation of a claimant's reported symptoms is supported by substantial evidence, the Court does not replace its own assessment for those of the ALJ; rather, the Court scrutinizes the evidence to determine if it is sufficient to support the ALJ's conclusions. In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence, reach independent determinations as to the

weight to be afforded to a claimant's report of symptoms, or substitute its own judgment for that of the Commissioner. *Hays*, 907 F.2d at 1456. Because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

In this case, the undersigned **FINDS** that the ALJ complied with the law in analyzing Claimant's credibility. The ALJ thoroughly considered the objective medical evidence, Claimant's treatment records, Claimant's alleged symptoms, and Claimant's statements regarding his abilities and activities. (Tr. at 20-25). The ALJ analyzed the consistency of Claimant's allegations when compared with the clinical observations and findings. The ALJ also compared Claimant's subjective complaints with the medical opinion evidence. (Tr. at 25-26). In assessing Claimant's statements regarding his symptoms, the ALJ cited specific record evidence and articulated the reasoning for his finding that Claimant's statements were not entitled to full weight. The ALJ was obliged to supply logical reasons grounded in substantial evidence to support the weight that he assigned to Claimant's statements regarding the intensity, persistence, and limiting effects of his symptoms. *See Bailey*, 2015 WL 9595499, at *19; *Murdock v. Colvin*, No. 5:14CV40, 2014 WL 9866441, at *3 (W.D.N.C. Nov. 19, 2014). Ultimately, the ALJ did just that.

### 4. Vocational Expert Testimony

Claimant next argues that the ALJ erred in not accepting the testimony of the vocational expert who stated that no jobs exist in the national economy for an individual who is off-task 10 percent of the workday or absent one day or more per month. (ECF No. 6 at 7). Undoubtedly, the ALJ was only obligated to accept such testimony upon a finding

that Claimant had such limitations. However, as noted by the Commissioner, Claimant does not cite to any evidence suggesting that he had such limitations or any evidence which the ALJ overlooked bearing on such issues. Indeed, there is no evidence during the relevant period stating that Claimant would be off-task or absent in excess of customary tolerances. Notably, the consulting psychologist who examined Claimant found that Claimant had at most mild mental limitations and the non-examining psychologist opined in February 2014 that Claimant had no significant limitation in performing activities within a schedule, maintaining regular attendance, being punctual, and completing a workday and workweek. (Tr. at 155). Therefore, the undersigned **FINDS** that substantial evidence supports the ALJ's decision to not accept the vocational expert's testimony that he could not work if he was off-task or absent in excess of acceptable tolerances.

### B. New Evidence Regarding Subsequent Award of DIB

A court may remand the Commissioner's decision for a rehearing under sentence four or sentence six of 42 U.S.C. § 405(g). As shown above, a sentence four remand is appropriate when the Commissioner's decision is not supported by substantial evidence, the Commissioner incorrectly applies the law in reaching the decision, or the basis of the Commissioner's decision is indiscernible. *Sharpe v. Berryhill*, No. 5:16-CV-3841, 2017 WL 1684531, at *10 (S.D.W. Va. Apr. 10, 2017), *report and recommendation adopted,* 2017 WL 1658930 (S.D.W. Va. May 1, 2017) (citation omitted). In contrast, a sentence six remand "may be ordered in only two situations: (1) where the Commissioner requests remand before answering the complaint, or (2) where new, material evidence is adduced that was for good cause not presented before the agency." *Id.*; *see Shalala v. Schaefer*, 509 U.S. 292, 297, n.2 (1993).

For the purposes of a sentence six remand, evidence is considered new only if it is not "duplicative or cumulative." *Wilkins v. Sec., Dep't of Health and Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991); *see also Bradley v. Barnhart*, 463 F.Supp.2d 577, 581 (S.D. W. Va. 2006). New evidence is material if it "bear[s] directly and substantially on the matter in dispute," and generates a "reasonable possibility that the new evidence would have changed the outcome of the determination." *Bradley*, 463 F.Supp.2d at 579-80 (citing *Bruton v. Massanari*, 268 F.3d 824 (9th Cir. 2001)).

In this circuit, a remand under sentence six for assessment of new and material evidence is appropriate if four prerequisites are met: (1) the evidence is relevant and not cumulative; (2) the Commissioner's decision "might reasonably have been different" had that evidence been presented; (3) good cause for failure to submit the evidence before the decision is established; and (4) Claimant offers "at least a general showing of the nature" of the newly discovered evidence. 42 U.S.C. 405(g); *Borders,* 777 F.2d at 955. The burden of showing that remand is appropriate rests with the claimant. *See Fagg v. Chater,* 1997 WL 39146, at *2 (4th Cir.1997); *Ferguson v. Commissioner of Social Sec.,* 628 F.3d 269, 276 (6th Cir. 2010) (citing *Foster v. Halter,* 279 F.3d 348, 357 (6th Cir. 2001)).

Typically, in the case of "remand under sentence six, the parties must return to the court after remand to file modified findings of fact. The reviewing court retains jurisdiction pending remand and does not enter a final judgment until after the completion of remand proceedings." *Hay v. Colvin*, No. 8:15-CV-00236-JDA, 2016 WL 536746, at *3 (D.S.C. Feb. 11, 2016) (citations omitted). However, in this case the undersigned has recommended that this action be remanded to the Commissioner under sentence four of 42 U.S.C. § 405(g) for proper consideration of Claimant's VA ratings because the ALJ incorrectly applied the law in reaching his decision. Notwithstanding

that recommendation, the action may additionally be remanded under sentence six on the basis of new and material evidence. *See Bradley v. Barnhart*, 463 F. Supp. 2d 577, 583 (S.D.W. Va. 2006) (Discussing dual remand under sentences four and six).

Applying the first two factors to the instant case, the undersigned finds that the evidence submitted by Claimant regarding his diagnosis of liver cancer is relevant, non-duplicative, and could reasonably have changed the ALJ's decision if it had been available and included in the record. Claimant's liver lesion was presented as a very minimal concern in the evidence that the ALJ reviewed. Although it was noted that Claimant had the lesion, it was believed to be benign at that time. (Tr. at 999, 1014-15, 1018, 1500). The few notes concerning Claimant's liver were diminutive in the vast context of medical records focusing on Claimant's skeletal and musculoskeletal complaints. In fact, when Claimant applied for DIB, he did not even list any issues concerning his liver as a reason that he was unable to work. (Tr. at 360).

Given the record, the ALJ found that Claimant's liver lesion was a non-severe impairment, stating: "As for the claimant's liver lesion, records show no continued workup to establish severity such as malignancy. As of the date of this decision, records do not indicate that the claimant's liver lesion more than minimally interferes with his ability to perform work related activity." (Tr. at 18). Consequently, the ALJ did not expressly consider Listing 13.19 (Cancer of the Liver, Gallbladder, or Bile Ducts) in rendering his decision.

Approximately one year after the ALJ's decision, Claimant's liver lesion was biopsied and discovered to be malignant. Claimant's physicians and the agency physician collectively relate Claimant's liver cancer to the lesion first seen in 2014, although Dr. Arrington does suggest that the lesion could have been benign initially. (ECF Nos. 10-2 at

6; 10-3 at 10; 10-4 at 4, 7). Nevertheless, the new evidence concerning Claimant's liver cancer is not cumulative of the records which the ALJ considered and they clearly fill an evidentiary gap; namely, that "continued workup" was indeed performed "to establish severity such as malignancy" of the lesion on Claimant's liver. *Wilkins*, 953 F.2d at 95–96 (Evidence is new if "no other evidence specifically addressed this issue."). As stated by the ALJ, there was no evidence in the record that showed that the lesion was malignant; this new evidence supplied by Claimant fulfills such gap.

The undersigned recognizes that the malignant nature of the lesion was not discovered until after the ALJ rendered his decision, which could lend credence to the Commissioner's argument that the new evidence supplied by Claimant does not relate to the period under review. However, it is axiomatic that simply because the lesion was biopsied and discovered to be cancerous in January 2017 does not indicate that it suddenly became cancerous at that time. Although there is no definitive opinion in the new records supplied by Claimant as to when the lesion became malignant, Claimant's physicians and the agency's expert all reference the fact that the lesion was identified in 2014, which was within the ALJ's period of review. Moreover, the agency's expert, Dr. Osborne, unequivocally concluded that Claimant had liver cancer earlier than the biopsy date. (ECF No. 10-2 at 7). Dr. Osborne thus amended Claimant's alleged onset date from December 18, 2012 to January 27, 2016. (*Id.* at 9). Dr. Osborne's reason for amending Claimant's date of onset was that it was the "date after the ALJ's decision" on Claimant's prior application. (*Id.*). It gives the undersigned pause that Dr. Osborne found that Claimant met Listing 13.19 as of January 27, 2016, the day after the ALJ's decision under review in this action, and the only apparent reason was to avoid offending the principle of *res judicata*.

In any event, the new evidence provided by Claimant clearly connects, in some fashion, his diagnosis of cancer to the lesion that was present in his liver during the period presently under review. It is ultimately the role of the ALJ to review the evidence and determine whether Claimant's liver lesion met Listing 13.19 during the relevant period or otherwise changed the ALJ's findings and ultimate decision as to whether Claimant was disabled prior to January 26, 2016. The Court is not at liberty to weigh the new evidence or resolve conflicts in the record. *See Fox v. Colvin*, 632 F. App'x 750, 755 (4th Cir. 2015). It has never been the province of the district court "to engage in these [fact-finding] exercises in the first instance." *Id. (*quoting *Radford v. Colvin,* 734 F.3d 288, 296 (4th Cir.2013)).

Further, as to the third factor favoring remand of this matter, Claimant establishes good cause for not submitting these records before the Commissioner's decision became final pursuant to the Appeals Council's denial of review on December 13, 2016. As noted, the new records supplied by Claimant begin on December 22, 2016. (ECF Nos. 10-1, 10-2, 10-3, 10-4). Therefore, they did not exist at the time of the Appeals Council's decision.

Finally, Claimant offers "at least a general showing of the nature" of the newly discovered evidence. Claimant submitted records confirming his diagnosis of cancer and an index of additional medical records of which he states that 915 pages constitute new and material evidence relating to Claimant's liver cancer. (ECF Nos. 10 at 3, 10-1 at 2).

Therefore, the undersigned **FINDS** that the decision of the Commissioner should be additionally remanded under sentence six to allow the ALJ to analyze and weigh the "new and material" evidence attached and referenced by Claimant as it relates to Claimant's liver impairment during the period under the ALJ's review. *See, e.g., Long obo Long v. Comm'r of Soc. Sec. Admin.*, No. 5:16CV143 (STAMP), 2017 WL 2438843, at *1,

3 (N.D.W. Va. June 6, 2017) ("The plaintiff had a long history of esophagus problems, but there was no evidence of esophageal cancer at the time of the ALJ's decision. A showing of esophageal cancer would have qualified the plaintiff as disabled. The ALJ's decision was based, at least in part, on a lack of evidence of cancer ... remand is necessary for the ALJ to make factual findings as to whether the subsequent evidence of esophageal cancer can be reconciled with the defendant's decision.").

### C. Appeals Council Consideration of New Evidence

Finally, the undersigned addresses Claimant's argument that the Appeals Council did not properly consider the "new and material evidence" that Claimant submitted for consideration. (6 at 8-9). Claimant calls attention to the May 7, 2016 report of Dr. Craig and a letter from the VA stating that Claimant was granted "individual employability" by the VA as of April 21, 2015 due to his inability to secure or follow a substantially gainful occupation as a result of service-connected disabilities. (*Id.* at 8).

When new and material evidence is submitted to the Appeals Council after the ALJ's decision, the Appeals Council:

> [S]hall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision. The Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the period on or before the date of the administrative law judge hearing decision. It will then review the case if it finds that the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record.

20 C.F.R §§ 404.970(b), 416.1470(b). Evidence is new when it is not "duplicative or cumulative," and is material "if there is a reasonable possibility that the new evidence would have changed the outcome." *Wilkins v. Secretary, Dep't of Health and Human Servs.,* 953 F.2d 93, 96 (4th Cir. 1991). When the Appeals Council incorporates new and material evidence into the administrative record, but denies review of the ALJ's findings

and conclusions, the inquiry before the reviewing court is whether the Commissioner's decision is supported by substantial evidence in light of "'the record as a whole' including any new evidence that the Appeals Council 'specifically incorporated ... into the administrative record.'" *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011) (quoting *Wilkins v. Sec'y, Dep't of Health and Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991) (internal marks omitted)); *see also Snider,* 2013 WL 4880158, at *5 ("[W]here a claimant has submitted additional evidence to the Appeals Council, and the Appeals Council considered that evidence and made it part of the record, this Court must review the record as a whole, including the new evidence, to determine whether substantial evidence supports the Commissioner's findings.").

New and material evidence does not automatically require remand, and certainly not simply because the ALJ never reviewed the evidence. Instead, the question is whether the lack of additional fact-finding pertinent to the new evidence "render[s] judicial review 'impossible'" because the record no longer provides "an adequate explanation of [the Commissioner's] decision." *Meyer,* 662 F.3d at 707. In *Meyer,* the United States Court of Appeals for the Fourth Circuit provided examples of when new and material evidence would or would not require remand. *Id.* For example, when the new evidence was generated by a treating physician, provided additional opinions not controverted by other evidence in the record, and constituted the only opinions of the treating physician, remand was generally required. *Id.* On the other hand, if substantial evidence supported the ALJ's decision, even when factoring in the new evidence, remand was unnecessary. *Id.*

Given the scope of judicial review in social security disability cases, "District Courts have limited the applicability of *Meyer* to those cases where an evidentiary gap exists in

the medical record," which is filled by the new and material evidence. *Meadows v. Berryhill*, No. 516CV00068RJCDSC, 2017 WL 4534771, at *4 (W.D.N.C. Oct. 11, 2017). Consequently, the reviewing court must "focus on determining whether [the] new evidence 'is contradictory, presents material competing testimony, or calls into doubt any decision grounded in the prior medical reports.' Where no such conflict is present, the case can be decided on the existing record without remand." *Flesher v. Colvin,* No. 2:14-cv-30661, 2016 WL 1271511, at *9 (S.D.W. Va. Mar. 31, 2016) *(*quoting *Dunn v. Colvin*, 973 F. Supp. 2d 630, 642 (W.D. Va. 2013)); *see, also, Yost v. Astrue*, No. CIV. A. TMD-08-2942, 2010 WL 311432, at *3 (D. Md. Jan. 19, 2010) ("[W]hile evidence considered by the Appeals Council must have been found to be "material", *i.e.* a reasonable possibility that it would have changed the outcome, that alone clearly does not necessitate a finding at the district court level that the case be remanded. Rather, at this juncture, the Court's role is to determine whether the record, as whole (including that evidence considered by the Appeals Council), supports the Commissioner's findings.") *and Turner v. Colvin*, No. 0:14-228-DCN, 2015 WL 751522, at *5 (D.S.C. Feb. 23, 2015) (holding that the "touchstone of the ... analysis [is] whether the record, combined with the new evidence, 'provides an adequate explanation of [the Commissioner's] decision.'"). Put simply, if the new evidence "is not in blatant contradiction with and does not cast serious doubt upon the original evidence reviewed by the ALJ, then remand is unnecessary if the ALJ's decision is supported by substantial evidence." *Shuman v. Berryhill*, No. 3:16-CV-62, 2017 WL 3476972, at *5 (N.D.W. Va. Aug. 14, 2017) (citing *Flesher*, 2016 WL 1271511, at *9–10).

The undersigned first considers the VA letter dated July 5, 2016, which states that Claimant was granted individual unemployability as of April 21, 2015 because he was

"unable to secure or follow a substantially gainful occupation as a result of service-connected disabilities." (Tr. at 1708). The letter also states that the service-connected disability rating for Claimant's lower extremity radiculopathy in both legs was increased from 10 to 20 percent and Claimant's overall combined rating increased from 70 to 80 percent. (Tr. at 1708, 1711). The Appeals Council incorporated this letter into the record and found that considering the record as a whole, including this new evidence, the ALJ's decision was not contrary to the weight of the evidence and the new evidence did not provide a basis for changing the ALJ's decision. (Tr. at 2).

The undersigned agrees with the Appeals Council's conclusion. The VA letter does not fill any evidentiary gap in the record. No additional explanation or supporting information is supplied. Therefore, by all indication, the information underlying the modest changes in the ratings were reflected in Claimant's treatment records and evaluations that the ALJ reviewed. However, as noted, the ALJ did not apply the appropriate standard in considering the VA ratings. Because this action is being remanded on that basis, as well as for consideration of the other new and material medical evidence discussed, this letter from the VA, which the Appeals Council incorporated into the record, will be considered by the ALJ on remand.

The undersigned next considers Dr. Craig's report and RFC assessment dated May 7, 2016. (Tr. at 7-10). Dr. Craig stated in the report that he examined Claimant at the request of Claimant's attorney for the purpose of a RFC evaluation. (Tr. at 7). He further stated that his opinions were based upon a review of Claimant's medical records available at that time, Claimant's reported medical history, and Dr. Craig's examination of Claimant on the same date that he completed the report. (*Id.*). The Appeals Council stated that it looked at Dr. Craig's medical source statement, but determined that it concerned a later

time period and did not affect the decision about whether Claimant was disabled on or before January 26, 2016. (Tr. at 2).

The undersigned recently considered a very similar issue in which a claimant argued that a report and RFC assessment prepared by Dr. Craig that was submitted to the Appeals Council constituted new and material evidence that warranted remand. *Maynard v. Berryhill*, No. 3:16-CV-10694, 2017 WL 5617511, at *22 (S.D.W. Va. Oct. 26, 2017), *report and recommendation adopted*, 2017 WL 5617069 (S.D.W. Va. Nov. 21, 2017). Like the present case, Dr. Craig's report and RFC evaluation in *Maynard* expressed his conclusions as to Claimant's functional abilities and his ability to work, but failed to document the actual findings from Dr. Craig's physical examination of Claimant.[5] *Id*. Also like this case, Dr. Craig's report and RFC assessment did "not present new, contradictory, or competing information that undermine[d] the physical findings considered by the ALJ." *Id*.

Here, Dr. Craig's report stated that Claimant's musculoskeletal problems included moderate to severe degenerative disc disease and osteoarthritis of the cervical and lumbosacral spine. (Tr. at 7). His cervical spine abnormalities were severe congenital and acquired spinal stenosis and multilevel disc herniations. (*Id*.). On physical examination, Claimant had markedly limited range of motion in his cervical and lumbosacral spine with marked segmental dysfunction, which were anatomical and due to pain. (*Id*.). Claimant also suffered from chronic bilateral knee pain due to patellofemoral inflammation, which, along with his spinal conditions, was expected to progressively worsen over time. (*Id*.). Dr. Craig stated that Claimant further suffered from hepatic steatosis with increased liver

---

[5] Although the Appeals Council in *Maynard* incorporated Dr. Craig's medical source statement into the record, but the Appeals Council did not do so in this case, much of the analysis discussed in *Maynard* applies to the instant matter.

enzymes, which were indicative of hepatic dysfunction that is often progressive and can lead to liver failure. (*Id.*). His hypertension was not well controlled and was 160/106 during the examination and he also suffered from morbid obesity, type 2 diabetes mellitus, and obstructive sleep apnea. (*Id.*). Dr. Craig opined that the combination of impairments made it impossible for Claimant to work a normal full-time job and his RFC was in the sedentary range. (*Id.*). Dr. Craig stated that Claimant could not reasonably be expected to compete in the job market with his limitations and conditions. (*Id.*). Further, Claimant had depression due to his pain, limitations, and inability to work for which he took medication. (*Id.*). Dr. Craig opined that Claimant could lift or carry no more than 10 pounds and could not carry any amount of weight occasionally or frequently. (Tr. at 8). Claimant could stand or walk for one to two hours, but could only walk or stand for less than an hour without interruption and must use a cane when ambulating. (Tr. at 9). Claimant could sit for four to five hours total, but for only one to two hours without interruption. (*Id.*). He could never perform postural activities except that he could rarely stoop. (*Id.*). He was limited in reaching and pushing/pulling due to his neck and upper extremity deficits and low back pain. (Tr. at 10). Further, Dr. Craig stated that it would be unsafe for Claimant to work in any industry or environment due to his physical limitations. (*Id.*).

Dr. Craig's statements based on Claimant's medical history and records certainly do not fill any evidentiary gaps in the record or introduce any new objective evidence. Rather, they appear to rely on the same information that the ALJ reviewed and analyzed. As to Dr. Craig's few statements regarding his examination of Claimant, such as his statement that Claimant exhibited "markedly limited range of motion in his cervical and lumbosacral spine with marked segmental dysfunction," Dr. Craig did not document any

of his findings to support his conclusions. By contrast, the ALJ reviewed extensive records regarding Claimant's subjective complaints, treatment, and imaging related to Claimant's back. (Tr. at 22-25). The ALJ also reviewed VA disability evaluations, including those completed by Dr. Adams on October 17, 2014 and Dr. Poskitt on August 24, 2015. (Tr. at 25). The VA physicians examined and documented their specific findings with respect to Claimant's limited forward flexion, extension, and lateral flexion and rotation. (Tr. at 1306-08, 1651). Dr. Adams noted that Claimant had tenderness to palpation in his mid-back paraspinal muscles and guarding and/or muscle spasms in his thoracolumbar spine. (Tr. at 1309). Dr. Poskitt stated that Claimant's limited range of motion and spinal conditions rendered him unable to bend over and pick up objects from the floor or lift more than 15 pounds. (Tr. at 1651, 1658).

Overall, while Dr. Craig's report and RFC assessment conflicts in various ways with those of the ALJ and agency consultants, remand is not required simply because differences of opinion exist. Instead, the undersigned looks at whether Dr. Craig's materials fill an evidentiary gap or cast into serious doubt the information relied upon by the ALJ, such that the court cannot adequately assess the ALJ's decision under the current record. In this case, the evidence from Dr. Craig offers no information that is contradictory, presents material competing testimony, or calls into doubt any decision grounded in the prior medical reports. In fact, Dr. Craig's report provides even less objective information than what was provided in the reports and evaluations in the record before the ALJ.

In this case, for all of the above reasons, the undersigned **FINDS** that the Appeals Council did not err in its consideration of the new evidence submitted by Claimant and the new evidence does not provide a basis to remand the ALJ's decision.

## VIII. Recommendations for Disposition

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **GRANT** Plaintiff's request for judgment on the pleadings, (ECF Nos. 6, 8), to the extent that it requests remand of the Commissioner's decision; **DENY** Defendant's request to affirm the decision of the Commissioner, (ECF No. 7); **REVERSE** the final decision of the Commissioner; **REMAND** this matter pursuant to sentences four and six of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this PF&R; and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727

F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Chambers, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** November 30, 2017

Cheryl A. Eifert
United States Magistrate Judge